# Exhibit C – Deposition of Lawrence Jeter

# In The Matter Of:
## *ELIZABETH BECKLEY vs.*
## *CITY OF ATLANTA, GEORGIA*

## *LAWRENCE JETER*
## *November 17, 2016*
## *30(b)(6) DEPOSITION*



## JPA REPORTING, LLC
### CERTIFIED COURT REPORTERS

1776 PEACHTREE STREET, N.W.
SUITE 390-N
ATLANTA, GEORGIA 30309
404-853-1811
1-888-947-2963

*Original File 1117Jeter16.txt*
*Min-U-Script® with Word Index*

1   and responding to requests for installation of
2   sidewalk curb ramps as contemplated by the 2009
3   settlement agreement between the City and the
4   Department of Justice.
5           First question with respect to that:  Are
6   you in general familiar with what we're referring to
7   by the 2009 settlement agreement between the City and
8   the Department of Justice?
9       A.   Yes.
10      Q.   And can you describe what that is for the
11  record.
12      A.   Well, the 2009 settlement agreement
13  identified deficiencies in our ADA ramps, facilities,
14  services.  And the City was required to do an
15  assessment and develop a plan to address those
16  deficiencies.  There were several components, one
17  dealing with facilities like I mentioned earlier,
18  services, sidewalks.
19      Q.   Do you have any awareness of how that
20  agreement came about?  Was there litigation, was there
21  something that led to a settlement agreement that you
22  know of?
23      A.   I do not know how that agreement came
24  about.
25      Q.   Okay.  But it's your understanding that

1   the City is bound by that agreement; is that fair to
2   say?
3        A.    Yes.
4        Q.    All right.  Let me ask you just kind of
5   broadly:  What are the City's policies and procedures
6   for receiving and responding to requests for
7   installation of sidewalk curb ramps?
8        A.    Well, primarily the City receives all our
9   requests via our customer service 311 system that's
10  tied to our work management system heads.
11              In the work management system requests for
12  repairs to sidewalks is inclusive of ADA ramps.  ADA
13  ramps are considered an integral component of
14  repairing sidewalks.  So those requests will come to
15  the department via our management system.
16       Q.    And if I was a person in a wheelchair that
17  wanted a curb ramp to be installed, how would I find
18  that 311 system?
19       A.    Well, it's noted on our web page.  It's
20  accessible on the website.
21       Q.    Okay.  I think I have access to the WiFi
22  here.  What is the web address for that?
23       A.    Atlantaga.gov.
24       Q.    So if I were to go to that website, where
25  would I find the -- I can't find it right now.  But if

Jeter Deposition Exhibit 2



# SETTLEMENT AGREEMENT BETWEEN

# THE UNITED STATES OF AMERICA

# AND

# ATLANTA, GEORGIA

# UNDER THE AMERICANS WITH DISABILITIES ACT

## DJ 204-19-216

Press Release | Fact Sheet

## BACKGROUND

### *SCOPE OF THE INVESTIGATION*

The United States Department of Justice (Department) initiated this matter as a compliance review of the City of Atlanta, Georgia, (City) under title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12131-12134, and the Department's implementing regulation, 28 C.F.R. Part 35. Because the City receives financial assistance from the Department of Justice, the review was also conducted under the authority of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Department's implementing regulation, 28 C.F.R. Part 42, Subpart G.

The review was conducted by the Disability Rights Section of the Department's Civil Rights Division and focused on the City's compliance with the following title II requirements:

- to conduct a self-evaluation of its services, policies, and practices by July 26, 1992, and make modifications necessary to comply with the Department's title II regulation, 28 C.F.R. § 35.105;
- to notify applicants, participants, beneficiaries, and other interested persons of their rights and the City's obligations under title II and the Department's regulation, 28 C.F.R. § 35.106;
- to designate a responsible employee to coordinate its efforts to comply with and carry out the City's ADA responsibilities, 28 C.F.R. § 35.107(a);
- to establish a grievance procedure for resolving complaints of violations of title II, 28 C.F.R. § 35.107(b);
- to operate each program, service, or activity so that, when viewed in its entirety, it is readily accessible to and usable by individuals with disabilities, 28 C.F.R. §§ 35.149, 35.150, by:
    - delivery of services, programs, or activities in alternate ways, including, for example, redesign of equipment, reassignment of services, assignment of aides, home visits, or other methods of compliance or, if these methods are not effective in making the programs accessible,
    - physical changes to buildings (required to have been made by January 26, 1995), in accordance with the Department's title II regulation, 28 C.F.R. §§ 35.150 and 35.151, and the ADA Standards for Accessible Design (Standards), 28 C.F.R. pt. 36, App. A, or the Uniform Federal Accessibility Standards (UFAS), 41 C.F.R. § 101-19.6, App. A.
- to ensure that facilities for which construction or alteration was begun after January 26, 1992, are readily accessible to and usable by people with disabilities, in accordance with 1) the Department's title II regulation and 2) the Standards or UFAS, 28 C.F.R. § 35.151;
- to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others, including furnishing auxiliary aids and services when necessary, 28 C.F.R. § 35.160;

- to provide direct access via TTY (text telephone) or computer-to-telephone emergency services, including 9-1-1 services, for persons who use TTY's and computer modems, 28 C.F.R. § 35.162;
- to provide information for interested persons with disabilities concerning the existence and location of the City's accessible services, activities, and facilities, 28 C.F.R. § 35.163(a); and
- to provide signage at all inaccessible entrances to each of its facilities, directing users to an accessible entrance or to information about accessible facilities, 28 C.F.R. § 35.163(b).

As part of its compliance review, the Department reviewed the following facilities, which – because construction or alterations commenced after January 26, 1992 – must comply with the ADA's new construction or alterations requirements: Coan Park, Municipal Court, Atlanta Police Department Zone 1, Atlanta Police Department Zone 5, Washington Park Natatorium, Atlanta Fire Station 14, Atlanta Fire Station 4, Adamsville Recreation Center, Bessie Branham Recreation Center, Utoy Creek Reclamation Center, Washington Park Tennis Center, Atlanta Botanical Garden, Rosel Fann Recreation Center, Cleveland Avenue Recreation Center, Ben Hill Recreation Center, Morningside Recreation Center, Martin L. King, Jr. Recreation Center, Atlanta City Detention Center, Atlanta Fire Station 33, Atlanta Workforce Development Agency, Coan Park Recreation Center, Police Office of Professional Standards, Anderson Park Recreation Center, A. D. Williams Park, Gateway Homeless Services Center, Atlanta Fire Station 31, Piedmont Park Conservancy Magnolia Hall, Georgia Hill Neighborhood Facility, Martin L. King, Jr. Natatorium, Bass Recreation Center, Chastain Park Amphitheater, Pitman Pool/Recreation Center, Peachtree Hills Recreation Center, and Central Park Recreation Center.

The Department's program access review covered those of the City's programs, services, and activities that operate in the following facilities: City Hall South, Atlanta City Hall Tower, Cyclorama & Civil War Museum, Public Defender's Office, Atlanta Police Department Zone 2, Atlanta Police Department Zone 6, Boisfeuillet Jones Atlanta Civic Center, Piedmont Park Conservancy/magnolia Hall, Candler Park Golf Course, Oakland Recreation Center, Adams Park & Recreation Center, Mcghee Tennis Center, Grant Park Recreation Center, Grant Park Swimming Pool, Brownwood Recreation Center, Bessie Branham Recreation Center, Atlanta Botanical Garden, Bitsy Grant Center, Collier Park and Recreation Center, Zaban Recreation Center, Atlanta Police Zone 3, Atlanta Police Zone 4, Atlanta Fire Station 15, Atlanta Fire Station 17, Atlanta Fire Station 35, Dunbar Neighborhood Facility, John C. Birdine Neighborhood Facility, and Maddox Park.

The Department also conducted a program access review of the Gateway Center, which is designated as an emergency shelter. This review was limited to the areas of the facility used by members of the public during an emergency: parking, the route from the parking area to the area used as a shelter, the area used as a shelter, and toilet facilities serving that area.

The Department reviewed the City's policies and procedures regarding voting, emergency management and disaster prevention, and sidewalk maintenance to evaluate whether persons with disabilities have an equal opportunity to utilize these programs.

Finally, the Department reviewed the City Police Department's policies and procedures regarding providing effective communication to persons who are deaf or hard-of-hearing.

## *JURISDICTION*

1. The ADA applies to the City because it is a "public entity" as defined by title II. 42 U.S.C. § 12131(1).
2. The Department is authorized under 28 C.F.R. Part 35, Subpart F, to determine the compliance of the City with title II of the ADA and the Department's title II implementing regulation, to issue findings, and, where appropriate, to negotiate and secure voluntary compliance agreements. Furthermore, the Attorney General is authorized, under 42 U.S.C. § 12133, to bring a civil action enforcing title II of the ADA should the Department fail to secure voluntary compliance pursuant to Subpart F.

3. The Department is authorized under 28 C.F.R. Part 42, Subpart G, to determine the City's compliance with section 504 of the Rehabilitation Act of 1973, to issue findings, and, where appropriate, to negotiate and secure voluntary compliance agreements. Furthermore, the Attorney General is authorized, under 29 U.S.C. § 794 and 28 C.F.R. §§ 42.530 and 42.108-110, to suspend or terminate financial assistance to the City provided by the Department of Justice should the Department fail to secure voluntary compliance pursuant to Subpart G or to bring a civil suit to enforce the rights of the United States under applicable federal, state, or local law.
4. The parties to this Agreement are the United States of America and the City of Atlanta, Georgia.
5. In order to avoid the burdens and expenses of an investigation and possible litigation, the parties enter into this Agreement.
6. In consideration of, and consistent with, the terms of this Agreement, the Attorney General agrees to refrain from filing a civil suit in this matter regarding all matters contained within this Agreement, except as provided in the section entitled "Implementation and Enforcement."

## ACTIONS TAKEN BY CITY

7. In 1992, the City appointed Guy Seymor, Chief Psychologist, as ADA Coordinator (ADAC), and he served in this capacity until 1999. In 2000, Alfred Elder, Diversity Manager, was appointed to serve as ADAC and addresses employee-related concerns. To ensure immediate and continued focus on disability issues related to citizens, the City created a Disability Coordinator (DC) position in July 1992. Kate Gainer, a local disability rights activist, was appointed DC. Kimberly Davies assumed the position in 2004 and addresses citizen related concerns.
8. The City conducted an ADA Facilities Self-Assessment from July 1994 through December 1994. Each department was required to physically inspect their respective spaces and complete a survey checklist form comprised of the ADA Standards. In January 2007, consistent with the spirit and intent of "Project Civic Access," the City conducted a self-assessment of its programs and facilities. The results of this evaluation were discussed with the Department of Justice's Disability Rights Section in February 2007.
9. The City has appointed a Departmental Equal Employment Opportunity Coordinator (DEEOC) for each of its departments in order to assist the ADAC and DC in resolving grievances raising disability-related issues. Procedures for addressing these issues are divided into two distinct processes, "Formal and Informal." In the "Informal Process," the DEEOC investigates and resolves issues at the departmental level. If the complainant is dissatisfied with the results of the "Informal Process, the ADAC initiates the "Formal Process" and renders a final determination. This process is most often utilized by employees. Citizens normally file complaints directly through the Mayor's Office of Constituent Services and they are investigated and resolved by the DC.

## REMEDIAL ACTION

### *NOTIFICATION*

10. Within two months of the effective date of this Agreement, the City will adopt the attached Notice (Attachment A); distribute it to all agency heads; publish the Notice in a local newspaper of general circulation serving the City; post the Notice on its Internet Home Page; and post copies in conspicuous locations in its public buildings. It will refresh the posted copies, and update the contact information contained on the Notice, as necessary, for the life of this Agreement. Copies will also be provided to any person upon request.
11. Within six months of the effective date of this Agreement, and on yearly anniversaries of this Agreement until it expires, the City will implement and report to the Department its written procedures for providing information for interested persons with disabilities concerning the existence and location of the City's accessible programs, services, and activities.

### *GRIEVANCE PROCEDURE*

12. Within three months of the effective date of this Agreement, the City will adopt the attached ADA Grievance Procedure (Attachment B), distribute it to all agency heads, and post copies of it in conspicuous locations in each of its public buildings. It will refresh the posted copies, and update the contact information contained on it, as necessary, for the life of the Agreement. Copies will also be provided to any person upon request.

## *GENERAL EFFECTIVE COMMUNICATION PROVISIONS*

13. Within three months of the effective date of this Agreement, the City will identify sources of qualified sign language and oral interpreters, real-time transcription services, and vendors that can put documents in Braille, and will implement and report to the Department its written procedures, with time frames, for fulfilling requests from the public for sign language or oral interpreters, real-time transcription services, and documents in alternate formats (Braille, large print, cassette tapes, accessible electronic format such as HTML, etc.).
14. The City will take steps to ensure that all appropriate employees are trained and practiced in using the Georgia Relay Service to make and receive calls.

## *9-1-1*

15. Within three months of the effective date of this Agreement, the City will ensure that each 9-1-1 call station is equipped with a TTY or computer equivalent.
16. Within three months of the effective date of this Agreement, the City will develop procedures for answering 9-1-1 calls that include training all call takers to use a TTY to take 9-1-1 calls, to recognize a "silent" open line as a potential TTY call and respond by TTY, and to ensure that TTY calls are answered as quickly as other calls received.
17. The City will monitor its incoming 9-1-1 TTY calls to ensure they are answered as quickly and accurately as other calls received.
18. The City will incorporate correct TTY call-taking procedures into 9-1-1 call takers' performance evaluations and will amend its personnel policies to include written disciplinary procedures for call takers who fail to perform TTY call-taking consistent with the training and procedures. The City will implement and report to the Department its evaluation and procedures within three months of the effective date of this Agreement.

## *LAW ENFORCEMENT AND EFFECTIVE COMMUNICATION*

19. Within three months of the effective date of this Agreement, the City will adapt for its own use and implement the Atlanta Police Department's Policy Statement on Effective Communication with People Who are Deaf or Hard of Hearing [Attachment C] and distribute to all police officers the *Guide for Law Enforcement Officers When in Contact with People Who are Deaf or Hard of Hearing* [Attachment D].
20. Within three months of the effective date of this Agreement, the City will contract with one or more local qualified oral/sign language interpreter agencies to ensure that the interpreting services will be available on a priority basis, twenty-four hours per day, seven days a week, to its police or make other appropriate arrangements (such as contracting directly with or hiring qualified interpreters).
21. Within three months of the effective date of this Agreement, the City will ensure that each police station or substation and each detention facility is equipped with a working TTY to enable persons who are deaf, hard of hearing, or who have speech impairments to make outgoing telephone calls. Where inmate telephone calls are time-limited, the City will adopt policies permitting inmates who use TTY's a longer period of time to make those calls, due to the slower nature of TTY communications compared with voice communications.

## *EMPLOYMENT*

22. Within three months of the effective date of this Agreement, the City will complete a review of its employment policies and amend them, as necessary, to comply with the regulations of the U.S. Equal Employment Opportunity Commission implementing title I of the Americans with Disabilities Act of 1990, codified at 29 C.F.R. Part 1630. At minimum, those policies will provide that the City:
    - will not discriminate on the basis of disability in its hiring or employment practices.
    - will not ask a job applicant about the existence, nature, or severity of a disability. Applicants may be asked about their ability to perform specific job functions. Medical examinations or inquiries may be made, but only after a conditional offer of employment is made and only if required of all applicants for the position.
    - will make reasonable accommodations for the known physical or mental limitations of a qualified applicant or employee with a disability upon request unless the accommodation would cause an undue hardship on the operation of the City's business. If an applicant or an employee requests a reasonable accommodation and the individual's disability and need for the accommodation are not readily apparent or otherwise known, the City may ask the individual for information necessary to determine if the individual has a disability-related need for the accommodation.
    - will maintain any employee's medical records separate from personnel files and keep them confidential.
    - will make an individualized assessment of whether a qualified individual with a disability meets selection criteria for employment decisions. To the extent the City's selection criteria have the effect of disqualifying an individual because of disability, those criteria will be job-related and consistent with business necessity.

## *EMERGENCY MANAGEMENT PROCEDURES AND POLICIES*

23. The Department will work collaboratively with the City to ensure that the City's Emergency Operations Plan (EOP) will be in compliance with ADA requirements. The touchstone for compliance with ADA requirements relating to emergency management is Chapter 7 of the Department's *ADA Best Practices Tool Kit for State and Local Government* (*ADA Tool Kit*), which addresses in detail key ADA obligations that apply to all aspects of emergency management, including planning, preparedness, evacuation, shelters, medical and social services, lodging and housing programs, recovery, and rebuilding.
24. The City is committed to compliance with the ADA requirements as described in Chapter 7 of the *ADA Tool Kit*. Within 60 days of the effective date of this Agreement, the City will revise its EOP so that it conforms with Chapter 7 of the *ADA Tool Kit*, and the City will provide a copy of its revised EOP (including supporting documents) to the Department. The Department will review the revised EOP to ensure compliance with title II of the ADA and its implementing regulation.
25. If the City contracts with another entity, such as the American Red Cross or another local government, to provide its emergency preparedness plans and emergency response services, the City will ensure that the other entity complies with the following provisions on its behalf.
26. Within three months of the effective date of this Agreement, the City will implement and report to the Department its written procedures that ensure that it regularly solicits and incorporates input from persons with a variety of disabilities and those who serve them regarding all phases of its emergency management plan (preparation, notification, response, and clean up).
27. Within three months of the effective date of this Agreement, the City will implement and report to the Department its written procedures that ensure that its community evacuation plans enable those who have mobility impairments, vision impairments, hearing impairments, cognitive disabilities, mental illness, or other disabilities to safely self-evacuate or be evacuated by others. Some communities are instituting voluntary, confidential registries of persons with disabilities who may need individualized evacuation assistance or notification. If the City adopts or maintains such a registry, its report to the Department will discuss its procedures for ensuring voluntariness, appropriate confidentiality controls, and how the registry will be kept updated, as well as its

outreach plan to inform persons with disabilities of its availability. Whether or not a registry is used, the City plan should address accessible transportation needs for persons with disabilities.

28. Within three months of the effective date of this Agreement, the City will implement and report to the Department its written procedures that ensure that if its emergency warning systems use sirens or other audible alerts, it will also provide ways to inform persons with hearing impairments of an impending disaster. The use of auto-dialed TTY messages to pre-registered individuals who are deaf or hard of hearing, text messaging, e-mails, open-captioning on local TV stations and other innovative uses of technology may be incorporated into such procedures, as well as lower-tech options such as dispatching qualified sign language interpreters to assist with emergency TV broadcasts.

29. Within three months of the effective date of this Agreement, the City will implement and report to the Department its written procedures that ensure that its facilities designated as emergency shelters have a back-up generator and a way to keep medications refrigerated (such as a refrigerator or a cooler with ice). Such shelters will be made available to persons whose disabilities require access to electricity and refrigeration, for example, for using life-sustaining medical devices, providing power to motorized wheelchairs, and preserving certain medications, such as insulin, that require refrigeration. The written procedures will include a plan for notifying persons of the location of such shelters.

30. Within three months of the effective date of this Agreement, the City will implement and report to the Department its written procedures that ensure that persons who use service animals are not separated from their service animals when sheltering during an emergency, even if pets are normally prohibited in shelters. The procedures will not segregate persons who use service animals from others but may take into account the potential presence of persons who, for safety or health reasons, should not be in contact with certain types of animals.

31. Some of the City's emergency shelters may be owned or operated by other public entities subject to title II or by public accommodations subject to title III and, as such, are subject to the obligation to provide program access or remove barriers to accessibility under the ADA. This Agreement does not limit such future enforcement action against the owners or operators of these facilities by any person or entity, including the Department.

32. Within one month of the effective date of this Agreement, the City will request in writing that each of the owners and operators of the shelter facilities listed in Attachment G will remove the noted barriers to access for persons with disabilities. The request will specify that the remediation be completed within one year of the effective date of this Agreement. The City will simultaneously send a courtesy copy of the request to the Department.

33. Within 14 months of the effective date of this Agreement, the City will survey the shelters listed in <u>Attachment G</u> to determine whether the noted barriers have been removed. If not all barriers have been removed, the City will identify within 18 months of the effective date of this Agreement an appropriate number of alternate shelters where the parking, exterior routes, entrances, interior routes to the shelter area, and toilet rooms to the shelter area comply with the Standards.

34. Within three months of the effective date of this Agreement and until all emergency shelters have accessible parking, exterior routes, entrances, interior routes to the shelter area, and toilet rooms and bathing facilities serving the shelter area, the City will identify and widely publicize to the public and to persons with disabilities and the organizations that serve them the most accessible emergency shelters.

35. Within 3 months of the effective date of this Agreement, it will develop, implement, and report to the Department its plans for providing equivalent opportunities for accessible post-emergency temporary housing to persons with disabilities. Within one year of the effective date of this Agreement, the City will ensure that information it makes available regarding temporary housing includes information on accessible housing (such as accessible hotel rooms within the community or in nearby communities) that could be used if people with disabilities cannot immediately return home after a disaster if, for instance, necessary accessible features such as ramps or electrical systems have been compromised.

## *SIDEWALKS*

36. Within three months of the effective date of this Agreement, the City will implement and report to the Department its written process for soliciting and receiving input from persons with disabilities regarding the accessibility of its sidewalks, including, for example, requests to add curb cuts at particular locations.
37. Within three months of the effective date of this Agreement, the City will identify and report to the Department all streets, roads, and highways that have been constructed or altered since January 26, 1992. Paving, repaving, or resurfacing a street, road, or highway is considered an alteration for the purposes of this Agreement. Filling a pothole is not considered an alteration for the purposes of this Agreement. Within three years of the effective date of this Agreement, the City will provide curb ramps or other sloped areas complying with the Standards or UFAS at all intersections of the streets, roads, and highways identified under this paragraph having curbs or other barriers to entry from a street level pedestrian walkway.
38. Beginning no later than three months after the effective date of this Agreement, the City will provide curb ramps or other sloped areas complying with the Standards or UFAS at any intersection having curbs or other barriers to entry from a street level pedestrian walkway, whenever a new street, road, or highway is constructed or altered.
39. Within three months of the effective date of this Agreement, the City will identify all street level pedestrian walkways that have been constructed or altered since January 26, 1992. Paving, repaving, or resurfacing a walkway is considered an alteration for the purposes of this Agreement. Within three years of the effective date of this Agreement, the City will provide curb ramps or other sloped areas complying with the Standards or UFAS at all places where a street level pedestrian walkway identified under this paragraph intersects with a street, road, or highway.
40. Beginning no later than three months after the effective date of this Agreement, the City will provide curb ramps or other sloped areas complying with the Standards or UFAS at all newly constructed or altered pedestrian walkways where they intersect a street, road, or highway.

## *WEB-BASED SERVICES AND PROGRAMS*

41. Within 1 month of the effective date of this Agreement, and on subsequent anniversaries of the effective date of this Agreement, the City will distribute to all persons – employees and contractors – who design, develop, maintain, or otherwise have responsibility for content and format of its website(s) or third party websites used by the City (Internet Personnel) the technical assistance document, "Accessibility of State and Local Government Websites to People with Disabilities," which is Attachment F to this Agreement (it is also available at www.ada.gov/websites2.htm).
42. Within three months of the effective date of this Agreement, and throughout the life of the Agreement, the City will do the following:
    A. Establish, implement, and post online a policy that its web pages will be accessible and create a process for implementation;
    B. Ensure that all new and modified web pages and content are accessible;
    C. Develop and implement a plan for making existing web content more accessible;
    D. Provide a way for online visitors to request accessible information or services by posting a telephone number or e-mail address on its home page; and
    E. Periodically (at least annually) enlist people with disabilities to test its pages for ease of use.

## *PHYSICAL CHANGES TO FACILITIES*

43. The elements or features of the City's facilities that do not comply with the Standards, including those listed in Attachments I, J, K, and L, prevent persons with disabilities from fully and equally enjoying the City's services, programs, or activities and constitute discrimination on the basis of disability within the meaning of 42 U.S.C. § 12132 and 28 C.F.R. §§ 35.149 and 35.150.
44. The City will comply with the cited provisions of the Standards when taking the actions required by this Agreement.

45. Within three months of the effective date of this Agreement, the City will install signage as necessary to comply with 28 C.F.R. § 35.163(b), after having surveyed all facilities that are the subject of this Agreement for the purpose of identifying those that have multiple entrances not all of which are accessible.
46. Newly Constructed Facilities: In order to ensure that the following spaces and elements in City facilities for which construction was commenced after January 26, 1992, are readily accessible to and usable by persons with disabilities, the City will take the actions listed in Attachments I and M.
47. Altered Facilities: In order to ensure that the following spaces and elements in City facilities for which alterations commenced after January 26, 1992, are readily accessible to and usable by persons with disabilities, the City will take the actions listed in Attachments J and M.
48. Program Access in City Existing Facilities: In order to ensure that each of the City's programs, services, and activities operating at a facility that is the subject of this Agreement, when viewed in its entirety, is readily accessible to and usable by persons with mobility impairments, the City will take the actions listed in Attachments K and M.
49. City Facilities and Programs Not Surveyed by the Department: The City will review compliance with the requirements of Title II of the ADA for those City facilities and programs that were not reviewed by the Department. Within 12 months of the effective date of this Agreement, the City will submit for review by the Department a detailed report listing the access issues identified during its review together with the corrective actions and completion dates proposed to resolve such issues. The review conducted by the City, the access issues identified, and the corrective actions and completion dates proposed will be consistent with the requirements of Title II of the ADA; the review of City facilities and programs conducted by the Department for purposes of this Agreement; and the access issues, corrective actions, and completion dates reflected in Attachments I, J, K, and M.

## *PROGRAM MODIFICATIONS*

50. Access to City Programs Housed in Others' Facilities: In order to ensure that the City's programs, services, and activities that are the subject of this Agreement and that are operated by the City at facilities owned or controlled by other entities, when viewed in its entirety, are readily accessible to and usable by persons with mobility impairments, the City will take the actions listed in Attachment L.

## *PROGRAMS FOR VICTIMS OF DOMESTIC VIOLENCE AND ABUSE*

51. If the City owns or operates any Domestic Violence Programs, within three months of the effective date of this Agreement, it will do the following:
    A. Whatever written information is provided regarding its Domestic Violence Programs will also be provided in alternate formats, including Braille, large print, audio recording, and electronic formats, upon request.
    B. Enter into contracts or make other arrangements with qualified sign language and oral interpreters to ensure their availability when required for effective communication with persons who are deaf or hard of hearing. The type of aid that will be required for effective communication will depend on the individual's usual method of communication, and the nature, importance, and duration of the communication at issue. In many circumstances, oral communication supplemented by gestures and visual aids, an exchange of written notes, use of a computer or typewriter, or use of an assistive listening device may be effective. In other circumstances, qualified sign language or oral interpreters are needed to communicate effectively with persons who are deaf or hard of hearing. The more lengthy, complex, and important the communication, the more likely it is that a qualified interpreter will be required for effective communication with a person whose primary means of communication is sign language or speech reading.

- C. If the City's Domestic Violence Programs operate a hotline to take telephone calls of an emergency nature, the City shall ensure that it provides equivalent service for persons who use TTY's, including providing direct-connection service for TTY users with hotline operators, without requiring TTY users to call through a third party operator, such as through the state or local Telecommunication Relay Services. The City will obtain the necessary equipment, establish the written procedures, and provide the training necessary to ensure effective communication by Hotline staff with direct-connection callers using TTY's, as well as the training necessary to respond to callers who use the Telecommunication Relay Services.
- D. Survey facilities used as shelters or designated as potential shelters – or for counseling, job training, education, clothing or household provisioning, or other aspects of Domestic Violence Programs – to ensure that adequate arrangements are available for potential clients and family members with disabilities, including adults and children who have mobility impairments, who are blind or have low vision, and who are deaf or hard of hearing. Within one year of the effective date of this Agreement, modify each such facility to remove the barriers or, alternatively, procure another, fully accessible facility to ensure that potential clients and family members with disabilities have integrated options when participating in a sheltering or other Domestic Violence program. Nothing in this Agreement requires any modifications that would compromise the confidentiality of a shelter or counseling center. Until there is a sufficient stock of accessible housing and other facilities within the sheltering program, City will implement written procedures ensuring that it has identified temporary accessible housing (such as accessible hotel rooms within the community or in nearby communities) and other facilities that could be used if people with disabilities need sheltering or inservice access to a Domestic Violence Program. The cost to potential clients of being housed or otherwise served in alternate accessible facilities shall not exceed any costs normally attributed to clients of the City's Domestic Violence Programs.
- E. Implement written procedures and modify, as appropriate, eligibility criteria, to ensure that no person with a disability is turned away from a shelter or otherwise denied the opportunity to benefit from the services of the City's Domestic Violence Programs on the basis of disability.
- F. Implement written procedures to ensure that persons with disabilities who use service animals are not denied or discouraged from participating in Domestic Violence Programs, are able to be housed and served in an integrated environment, and are not separated from their service animals while participating in the City's Domestic Violence Programs even if pets are normally not permitted in the facilities where such programs are conducted. The procedures will not unnecessarily segregate persons who use service animals from others but may take into account the potential presence of persons who, for safety or health reasons, should not be in contact with certain types of animals. If the City's Domestic Violence Programs require clients to make any payments for shelter or other services they provide, clients shall not be required to make additional payments because they or their family members use service animals.
- G. Implement written procedures to ensure that reasonable modifications are made to the City's Domestic Violence Programs when necessary for a client or family member with a disability to participate in such Programs, unless doing so would fundamentally alter the nature of the program.
- H. Implement written policies to ensure that despite any "drug-free" policy of the City's Domestic Violence Programs, persons with disabilities who use medication prescribed for their use are able to continue using such medication while participating in such Programs or being housed in a shelter.
52. 52. If the City contracts with another entity to provide or operate programs that provide shelter, counseling, or other assistance or supportive services to victims of domestic violence or abuse and their families (hereafter referred to as "Domestic Violence Programs"), it will ensure that the other entity complies with the preceding provisions on its behalf. If that entity will not comply with the

following provisions, the City will nonetheless take all necessary steps to ensure that its program is accessible to persons with disabilities.

53. 53. Some of the of the City's shelters may be owned or operated by other public entities subject to title II or by public accommodations subject to title III and, as such, are subject to the obligation to provide program access or remove barriers to accessibility under the ADA. This Agreement does not limit such future enforcement action against the owners or operators of these facilities by any person or entity, including the Department.
54. 54. This Agreement shall not be construed to require the City to divulge confidential information relating to the location or existence of any Domestic Violence Programs, beyond what is otherwise required by applicable law or what is necessary for the Department to effectively enforce this Agreement.

## *MISCELLANEOUS PROVISIONS*

55. Except as otherwise specified in this Agreement, at yearly anniversaries of the effective date of this Agreement until it expires, the City will submit written reports to the Department summarizing the actions the City has taken pursuant to this Agreement. Reports will include detailed photographs showing measurements, architectural plans, work orders, notices published in the newspaper, copies of adopted policies, and proof of efforts to secure funding/assistance for structural renovations or equipment.
56. Throughout the life of this Agreement, consistent with 28 C.F.R. § 35.133(a), the City will maintain the accessibility of its programs, activities, services, facilities, and equipment, and will take whatever actions are necessary (such as routine testing of accessibility equipment and routine accessibility audits of its programs and facilities) to do so. This provision does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs. 28 C.F.R. § 35.133(b).
57. Within six months of the effective date of this Agreement, the City will develop or procure a two-hour training program on the requirements of the ADA and appropriate ways of serving persons with disabilities. The City will use the ADA technical assistance materials developed by the Department and will consult with interested persons, including individuals with disabilities, in developing or procuring the ADA training program.
58. Within one year of the effective date of this Agreement, the City will deliver its training program to all City employees who have direct contact with members of the public. At the end of that period, the City will submit a copy of its training curriculum and materials to the Department, along with a list of employees trained and the name, title, and address of the trainer.

## **IMPLEMENTATION AND ENFORCEMENT**

59. If at any time the City desires to modify any portion of this Agreement because of changed conditions making performance impossible or impractical or for any other reason, it will promptly notify the Department in writing, setting forth the facts and circumstances thought to justify modification and the substance of the proposed modification. Until there is written Agreement by the Department to the proposed modification, the proposed modification will not take effect. These actions must receive the prior written approval of the Department, which approval will not be unreasonably withheld or delayed.
60. The Department may review compliance with this Agreement at any time. If the Department believes that the City has failed to comply in a timely manner with any requirement of this Agreement without obtaining sufficient advance written agreement with the Department for a modification of the relevant terms, the Department will so notify the City in writing and it will attempt to resolve the issue or issues in good faith. If the Department is unable to reach a satisfactory resolution of the issue or issues raised within 30 days of the date it provides notice to the City, it may institute a civil action in federal district court to enforce the terms of this

Agreement, or it may initiate appropriate steps to enforce title II and section 504 of the Rehabilitation Act.

61. For purposes of the immediately preceding paragraph, it is a violation of this Agreement for the City to fail to comply in a timely manner with any of its requirements without obtaining sufficient advance written agreement with the Department for an extension of the relevant time frame imposed by the Agreement.
62. Failure by the Department to enforce this entire Agreement or any provision thereof with regard to any deadline or any other provision herein will not be construed as a waiver of the Department's right to enforce other deadlines and provisions of this Agreement.
63. This Agreement is a public document. A copy of this document or any information contained in it will be made available to any person by the City or the Department on request.
64. This Agreement constitutes the entire agreement between the parties on the matters raised herein, and no other statement, promise, or agreement, either written or oral, made by either party or agents of either party, that is not contained in this written Agreement (including its Attachments, which are hereby incorporated by reference), will be enforceable. This Agreement does not purport to remedy any other potential violations of the ADA or any other federal law. This Agreement does not affect the City's continuing responsibility to comply with all aspects of the ADA and section 504 of the Rehabilitation Act.
65. This Agreement will remain in effect for three years or until the parties agree that all actions required by the Agreement have been completed, whichever is later.
66. The person signing for the City represents that he or she is authorized to bind the City to this Agreement.
67. The effective date of this Agreement is the date of the last signature below.

| For the City of Atlanta, Georgia: | For the United States: |
|---|---|
| By: _____ | THOMAS E. PEREZ |
| SHIRLEY FRANKLIN, Mayor | Assistant Attorney General for Civil Rights |
| City of Atlanta | |
| Office of the Mayor | JOHN L. WODATCH, Chief |
| 55 Trinity Avenue, SW | JEANINE M. WORDEN, Deputy Chief |
| Suite 2400 | DOV LUTZKER, Special Counsel |
| Atlanta, GA 30303 | |
| (404) 330-6100 | By:_____ |
| | NAOMI MILTON, Supervisory Attorney |
| Date: _____ | |
| | By:_____ |
| _____ | TERRY D. FULTON, Investigator |
| Municipal Clerk (Seal) | MICHELE MALLOZZI, Architect |
| | Disability Rights Section - NYA |
| RECOMMENDED: | Civil Rights Division |
| _____ | U.S. Department of Justice |
| Chief Operating Officer | 950 Pennsylvania Avenue, N.W. |
| | Washington, DC 20530 |
| | (202) 307-0663 |
| APPROVED AS TO FORM: | (202) 514-7821 (fax) |
| _____ | |
| City Attorney | Date: _____12/08/2009_____ |

Project Civic Access | ADA Home Page

December 10, 2009