**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| ELIZABETH BECKLEY, )<br><br>Plaintiff, )<br><br>v. )<br><br>CITY OF ATLANTA, )<br><br>Defendant. ) | Case No. 1:16-cv-01435-MHC |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant CITY OF ATLANTA (the "City"), by its counsel and pursuant to

Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, hereby

submits its Statement of Undisputed Material Facts in Support of Its Motion for

Summary Judgment as follows:

**I.    Plaintiff Elizabeth Beckley Is A Qualified Individual With A**
**Disability Under The Americans With Disabilities Act ("ADA").**

1.    Elizabeth Beckley is a 30-year-old woman who relocated to Atlanta,

Georgia, from Orlando, Florida, with her husband in October 2015.  (Exhibit A –

Deposition of Elizabeth Beckley ("Beckley Dep.") at 7, ll. 2-22).

2.     Ms. Beckley is a wheelchair-bound paraplegic/quadriplegic.  (Beckley Dep. at 14, ll. 11-16).

3.     Ms. Beckley cannot walk, and she does not have any sensation or feeling in the lower half of her body.  (Beckley Dep. at 14, ll. 17-24).

4.     Ms. Beckley's paralysis is the result of a car accident in 2008. (Beckley Dep. at 14, l. 25-p. 15, l. 5).

5.     In 2009, Ms. Beckley was charged with felony DUI manslaughter for the 2008 accident in which her friend died when Ms. Beckley's car hydroplaned and struck a tree.  (Beckley Dep. at 10, ll. 7-19; p. 14, l. 25-p. 15, l. 5).

## II.     Ms. Beckley Travels To The Georgia Dome And Encounters Difficulty By Choosing A Less Accessible Travel Route.

6.     On December 31, 2015, Ms. Beckley, her husband, and her uncle traveled to the Georgia Dome for the Chick-fil-A Bowl.  (Beckley Dep. at 17, ll. 2-15).

7.     Prior to December 31, 2015, Ms. Beckley had never visited the Georgia Dome as this trip was her first visit.  (Beckley Dep. at 19, ll. 11-13).

8.     After parking their vehicle at a parking deck located near the CNN Center, Ms. Beckley and her companions crossed the street where the CNN Center is located, made a left onto another street, and then followed the crowd of people headed to the Georgia Dome.  (Beckley Dep. at 18, l. 1-p. 19, l. 4).

9. When asked whether she had any difficulty getting from the parking deck to the Georgia Dome, Ms. Beckley replied, "[n]ot as much that way." (Beckley Dep. at 19, ll. 7-10).

10. After the Chick-fil-A Bowl ended, Ms. Beckley and her companions did not take the same travel route to return to the parking deck. (Beckley Dep. at 19, ll. 14-17).

11. Ms. Beckley took a different route back to the parking deck because "it was easier to go with the flow of people and follow the direction they were going to try to get back to the car versus me trying to fight my way through to go back the other way when everybody else was going a specific way… I just go with the flow of traffic. Whatever is going to be easiest for me in my chair." (Beckley Dep. at 19, l. 23-p. 20, l. 6).

12. Ms. Beckley encountered difficulty traveling from the Georgia Dome back to the parking deck. (Beckley Dep. at 19, ll. 7-9).

13. Specifically, as detailed in an exhibit to her Complaint, Ms. Beckley traveled Richard B. Russell Plaza until she reached Martin Luther King, Jr. Drive. (Beckley Dep. at 20, ll. 19-25; <u>see</u> Beckley Dep. Ex. 1 at Doc. No. 1-2).

14. Ms. Beckley then traveled along Martin Luther King, Jr. Drive, made a left turn, and continued on the sidewalk. (Beckley Dep. at 20, l. 25-p. 21, l. 3).

15.     She eventually reached Centennial Olympic Park Drive where it intersects with Martin Luther King, Jr. Drive and discovered that there was no wheelchair ramp located at the intersection.  (Beckley Dep. at 21, ll. 4-6).

16.     Because there was no ramp and she could not cross the street at the intersection, Ms. Beckley traveled down Centennial Olympic Park Drive until she reached a ramp at the very end of Centennial Olympic Park Drive where the traffic light is located.  (Beckley Dep. at 21, ll. 4-14).

17.     Ms. Beckley then crossed the street, got onto the sidewalk, and continued along Centennial Olympic Park Drive to the three-way intersection where she discovered that there was no wheelchair ramp located at that intersection.  (Beckley Dep. at 21, ll. 14-22).

18.     Ms. Beckley then backtracked to Martin Luther King, Jr. Drive to get to Ted Turner Drive where she discovered that there was no ramp located there so that she could cross the street.  (Beckley Dep. at 21, l. 23-p. 22, l. 6).

19.     Ms. Beckley was attempting to cross Martin Luther King, Jr. Drive to get onto a sidewalk and then take Centennial Olympic Park Drive back to the parking garage.  (Beckley Dep. at 22, ll. 7-10).

20.     Ms. Beckley could not cross the street because the curbs she encountered were "literally like the biggest curbs [she'd] ever seen in [her] life." (Beckley Dep. at 22, ll. 10-12).

21.     At that point, Ms. Beckley was "devastated and dumbfounded by the discrimination" she was allegedly experiencing in a "big old city"… with "[t]ons of people in wheelchairs here."  (Beckley Dep. at 22, ll. 14-18).

22.     Ms. Beckley then told her husband that he needed to direct traffic so that she could drive her wheelchair in the street until she found a ramp.  (Beckley Dep. at 22, ll. 18-21).

23.     Ms. Beckley drove her wheelchair down Richard B. Russell Plaza, where a ramp was located that allowed her to turn onto Martin Luther King, Jr. Drive.  (Beckley Dep. at 22, l. 23-p. 23, l. 2; p. 23, ll. 6-16).

24.     Her husband attempted to direct traffic to go around Ms. Beckley's wheelchair while people were honking their car horns at her.  (Beckley Dep. at 23, ll. 1-5).

25.     Ms. Beckley traveled down Richard B. Russell Plaza and turned left onto Martin Luther King, Jr. Drive to reach Centennial Olympic Park Drive. (Beckley Dep. at 23, ll. 14-20).

26.     Ms. Beckley continued along Centennial Olympic Park Drive for approximately four to five minutes until she reached a ramp where she could safely get onto the sidewalk.  (Beckley Dep. at 23, l. 21-p. 24, l. 13).

27.     It was approximately 4:30 p.m. or 5:00 p.m. when Ms. Beckley began traveling the route back to the parking deck.  (Beckley Dep. at 24, ll. 19-22).

28.     It took Ms. Beckley two hours to get from the Georgia Dome back to the parking deck using the route reflected in the map attached to her Complaint. (Beckley Dep. at 24, ll. 14-18).

29.     Ms. Beckley is seeking compensatory damages from the City in her lawsuit.  (Beckley Dep. at 26, ll. 7-11).

30.     Ms. Beckley has not specified the amount of damages she is seeking in this lawsuit; however, she is requesting "whatever the jury believes is fair." (Beckley Dep. at 27, l. 20-p. 28, l. 3).

### III.     The City's Policies And Procedures Strictly Prohibit Discrimination Against Disabled Individuals.

31.     In accordance with Title II of the ADA, the City does not discriminate against qualified individuals with disabilities on the basis of disability in the City's services, programs, or activities.  (Exhibit B – Declaration of Angela Campbell ("Campbell Decl."), ¶ 5; see Exhibit B-1 – COA ADA Compliance Policy; Exhibit B-2 – ADA Transition Plan at Beckley-COA 000004).

32.     The City's anti-discrimination policy is available to the public on the City's website at www.atlantaga.gov.  (Campbell Decl., ¶ 6).

33.     The anti-discrimination policy is also included in the City's ADA Transition Plan, which is available on the City's website.  (Campbell Decl., ¶ 7; see Ex. B-2 at Beckley-COA 000004-5).

34.     The purpose of the Transition Plan is "to ensure that the residents of the City of Atlanta are provided full access to the City's programs, services, and activities in as timely a fashion as is reasonably possible."  (Campbell Decl., ¶ 8; see Ex. B-2 at Beckley-COA 000005).

35.     The Transition Plan encompasses the City's rights-of-way including, but not limited to, bridges, roadways, sidewalks, and streets.  (Campbell Decl., ¶ 9; see Ex. B-2 at Beckley-COA 000004).

36.     As noted in the Transition Plan, the "City will make all reasonable modifications to policies and programs to ensure that people with disabilities have an equal opportunity to enjoy all City programs, services, and activities." (Campbell Decl., ¶ 10; see Ex. B-2 at Beckley-COA 000004).

37.     The City has adopted a formal grievance procedure for the prompt and equitable resolution of complaints alleging violations of Title II of the ADA and

applicable state laws.  (Campbell Decl., ¶ 11; see Ex. B-2 at Beckley-COA 000007).

38.     The grievance procedure is available to any individuals who want to submit a complaint alleging discrimination on the basis of their disability in the provision of services, activities, facilities, and programs by the City.  (Campbell Decl., ¶ 12; see Ex. B-2 at Beckley-COA 000007).

39.     A disabled individual or his/her representative may file a complaint form with the City's ADA Coordinator within sixty (60) days from the date of the alleged discrimination.  (Campbell Decl., ¶ 13; see Ex. B-2 at Beckley-COA 000014-15).

40.     The ADA Coordinator coordinates the City's efforts to comply with and carry out its responsibilities under Title II of the ADA, including investigations of complaints submitted to the City alleging its noncompliance or alleging any actions that would be prohibited under the ADA.  (Campbell Decl., ¶ 14; see Ex. B-2 at Beckley-COA 000006).

41.     Within thirty (30) days of receipt of the complaint, the ADA Coordinator or his/her designee will respond to the complaint.  (Campbell Decl., ¶ 15; see Ex. B-2 at Beckley-COA 000007).

42.     If the ADA Coordinator's response does not satisfactorily resolve the issue, the complainant may appeal the decision to the City's Law Department within fifteen (15) days after receipt of the ADA Coordinator's response. (Campbell Decl., ¶ 16; <u>see</u> Ex. B-2 at Beckley-COA 000007).

43.     Within fifteen (15) days after receipt of the appeal, the Law Department, or an appointed representative, will: (1) meet with or contact the complainant to discuss the complaint and possible resolution; and (2) respond in writing (or in a format accessible to the complainant) regarding the final resolution of the complaint.  (Campbell Decl., ¶ 17; <u>see</u> Ex. B-2 at Beckley-COA 000007).

44.     All written complaints received by the ADA Coordinator, appeals to the Law Department, and responses from the ADA Coordinator and the Law Department will be retained by the City for three years after final resolution. (Campbell Decl., ¶ 18; <u>see</u> Ex. B-2 at Beckley-COA 000007).

45.     In responding to requests for structural improvements submitted through the grievance procedure, the ADA Coordinator is limited to funds designated for Capital Improvement Projects and other miscellaneous funds. (Campbell Decl., ¶ 19; <u>see</u> Ex. B-2 at Beckley-COA 000008).

46.     In the event that allocated funds are insufficient or have already been spent, subsequent improvements will be prioritized and scheduled in subsequent fiscal years.  (Campbell Decl., ¶ 20; see Ex. B-2 at Beckley-COA 000008).

47.     Despite the City's grievance procedure, Ms. Beckley never submitted a complaint to the City related to the allegations in her Complaint.  (Campbell Decl., ¶ 21).

48.     The City has not received any complaints from Ms. Beckley or any other disabled individuals regarding the ADA accessibility of the pedestrian crosswalks or sidewalks at the intersection of Centennial Olympic Park Drive and Martin Luther King, Jr. Drive.  (Id.)

49.     In addition to filing a complaint with the ADA Coordinator, a disabled individual can request that the City install ADA compliant ramps on City-owned sidewalks by contacting the City's 311 customer service system.  (Exhibit C – Deposition of Lawrence Jeter ("Jeter Dep.") at 14, ll. 4-15; see Exhibit B-3 – About ATL311).

50.     Information about the 311 customer service system is available to the public on the City's website at www.atlantaga.gov.  (Jeter Dep. at 14, ll. 16-23; Campbell Decl., ¶ 2; see Ex. B-3).

51.     The City's Customer Service Center is open Monday through Friday from 7:00 a.m. until 6:00 p.m. to accept telephone calls through the 311 system. (Campbell Decl., ¶ 3; see Ex. B-3).

52.     The City's 311 customer service system is also available 24 hours a day every day of the year via the website www.atl311.com.  (Id.)

53.     Ms. Beckley never contacted the City's 311 customer service system to request the installation of ADA ramps at any location in Atlanta.  (Campbell Decl., ¶ 4).

## IV.     The City Enters Into A Settlement Agreement With The U.S. Department Of Justice To Ensure Compliance With The ADA.

54.     In 2009, the City entered into a settlement agreement ("2009 Settlement Agreement") with the United States Department of Justice ("DOJ") to ensure the City's compliance with Title II of the ADA.  (See Jeter Dep. Ex. 2).

55.     Prior to executing the 2009 Settlement Agreement, the DOJ conducted a compliance review of the City under Title II of the ADA.  (Jeter Dep. Ex. 2 at 1).

56.     The DOJ also conducted a compliance review under Section 504 of the Rehabilitation Act because the City receives financial assistance from the DOJ. (Id.)

57.     The 2009 Settlement Agreement identified deficiencies in the City's ADA ramps, facilities, and services.  (Jeter Dep. at 13, ll. 5-14).

58.     Pursuant to the 2009 Settlement Agreement, the City was required to conduct an assessment and to develop a plan to address the deficiencies.  (Jeter Dep. at 13, ll. 10-18).

59.     The City developed and implemented its Transition Plan, as described above, to comply with the 2009 Settlement Agreement.  (See Campbell Decl., ¶ 7-8; Ex. B-2).

60.     The 2009 Settlement Agreement requires the City to "identify and report to the Department all streets, roads, and highways that have been constructed or altered since January 26, 1992."  (Jeter Dep. Ex. 2 at 7).

61.     "Paving, repaving, or resurfacing a street, road, or highway is considered an alteration for the purposes of this Agreement."  (Id.)

62.     "Filling a pothole is not considered an alteration for the purposes of this Agreement."  (Id.)

63.     For streets, roadways, or highways that have been constructed or altered since January 26, 1992, the City must provide ADA compliant curb ramps or other sloped areas at all intersections with curbs or other barriers to entry from a street level pedestrian walkway.  (Id.)

64.     The intersection of Centennial Olympic Park Drive and Martin Luther King, Jr. Drive, where Ms. Beckley allegedly encountered difficulty on December

31, 2015, has not been paved, repaved, or resurfaced since January 26, 1992.

(Exhibit D – Deposition of Michele Wynn ("Wynn Dep.") at 39, ll. 1-21; p. 41, ll.

3-7; Exhibit E – Declaration of Michele Wynn ("Wynn Decl."), ¶ 2).

65.     Centennial Olympic Park Drive and Martin Luther King, Jr. Drive

converge at a bridge, which is where the intersection at issue is located.  (Wynn

Decl., ¶ 3; Exhibit F – Declaration of Michael Ayo ("Ayo Decl."), ¶ 3).

66.     The City does not repave or resurface bridges because that process,

which requires digging up old asphalt to replace it with new asphalt, can damage

the substructure of the bridge.  (Wynn Dep. at 39, l. 13-p. 40, l. 9; Wynn Decl., ¶

3).

67.     The City also does not use the process of microsurfacing—applying a

really thin layer of asphalt—on bridges.  (Wynn Dep. at 39, l. 22-p. 40, l. 4; Wynn

Decl., ¶ 4).

68.     The City began using the microsurfacing process within the last three

years, and it is only used on very small local streets such as streets found in

residential neighborhoods.  (Wynn Dep. at 40, ll. 17-25; Wynn Decl., ¶ 4).

69.     With respect to bridges, the City does not repave or resurface a bridge

but expects that the surface will maintain itself throughout the life of the bridge

until the bridge can be replaced.  (Wynn Dep. at 40, ll. 5-16; Wynn Decl., ¶ 5).

70.     The roadway surface of the bridge at Centennial Olympic Park Drive

and Martin Luther King, Jr. Drive is concrete, not asphalt.  (Exhibit G – Deposition

of Michael Ayo ("Ayo Dep.") at 11, l. 8-p. 12, l. 2; Ayo Decl., ¶ 4).

71.     The City does not resurface concrete roadways because the concrete

surface is very resilient and does not wear out as often as asphalt roadways.  (Ayo

Dep. at 11, l. 8-p. 12, l. 2; Ayo Decl., ¶ 4).

**V.     The City Identifies A Significant Backlog Of ADA Ramp Repairs
         Caused By Inadequate Funding.**

72.     In January 2011, the City published its 2010 State of the City's

Transportation Infrastructure & Fleet Inventory Report ("2010 Report").  (Wynn

Decl., ¶ 6; see Exhibit E-1 – 2010 Report at 1).

73.     In the 2010 Report, the City's Department of Public Works ("DPW")

provided an assessment of the City's transportation infrastructure and fleet

inventory as well as a catalog of the City's maintenance progress since 2008.

(Wynn Decl., ¶ 7; see Ex. E-1 at 1).

74.     The 2010 Report included an assessment of the City's transportation

infrastructure, including the condition of streets and sidewalks.  (Wynn Decl., ¶ 8;

see Ex. E-1 at 1).

75.     According to the 2010 Report, it is estimated that the City has 2,158

miles of sidewalks and curbing.  (Wynn Decl., ¶ 8; see Ex. E-1 at 9).

76.     As noted in the 2010 Report, the City is required by the 2009 Settlement Agreement to identify and install ADA compliant curb ramps at sidewalks located on streets resurfaced since January 26, 1992.  (Wynn Decl., ¶ 9; see Ex. E-1 at 11).

77.     DPW intends to do more than what is required by the 2009 Settlement Agreement by ultimately providing ADA compliant curb ramps at all sidewalk locations throughout the City.  (Wynn Decl., ¶ 10; see Ex. E-1 at 11).

78.     As noted in the 2010 Report, the City submitted to the DOJ an inventory of ADA ramp needs identified as Priority 1 (High) and Priority 2 (Medium) ramps, which are all located on roads or streets that have been resurfaced since 1992, scheduled for improvements.  (Wynn Decl., ¶ 10; see Ex. E-1 at 12).

79.     Low priority ramps are those ramps not included in the DOJ mandate because they are located on streets that have not been resurfaced since 1992.  (Wynn Decl., ¶ 11; see Ex. E-1 at 12).

80.     DPW identified an ADA ramp repair inventory backlog of $52 million in its 2010 Report.  (Wynn Decl., ¶ 12; see Ex. E-1 at 13).

81.     DPW noted that the deterioration of ADA ramps will continue every year until the backlog is eliminated.  (Id.)

82.     DPW further recommended that once the backlog has been addressed, the City should designate approximately $5 million annually toward an ADA ramp maintenance program.  (Wynn Decl., ¶ 13; <u>see</u> Ex. E-1 at 13).

83.     The 2010 Report also included an assessment of the City's 164 bridges.  (Wynn Decl., ¶ 14; <u>see</u> Ex. E-1 at 6).

84.     At the time of the 2010 Report, the average age of the City's bridge structures was 57 years.  (<u>Id.</u>)

85.     The Georgia Department of Transportation ("GDOT"), upon completion of its bi-annual inspection of bridges, assigns Sufficiency Ratings for each bridge.  (Wynn Decl., ¶ 15; <u>see</u> Ex. E-1 at 6).

86.     Any bridge with a sufficiency rating below 50 is considered to be a candidate for major repairs or replacement.  (<u>Id.</u>)

87.     At approximately $288.58 million, bridge maintenance and replacement represent the largest dollar investment required to improve Sufficiency Ratings of all bridges to a rating of 75 or above.  (Wynn Decl., ¶ 16; <u>see</u> Ex. E-1 at 6).

88.     The 2010 Report identified a total backlog of approximately $922 million in transportation infrastructure replacement projects.  (Wynn Decl., ¶ 17; <u>see</u> Ex. E-1 at 1).

89.     DPW recommended that once the backlog has been addressed or eliminated, the City would need to make an estimated annual investment of approximately $95 million a year, representing a 269% funding gap, to maintain the aging transportation infrastructure and fleet inventory as well as prevent another backlog.  (Wynn Decl., ¶ 18; see Ex. E-1 at 2).

## VI.    Atlanta Voters Overwhelmingly Support An Infrastructure Bond That Allots Funding For ADA Improvements And Repairs.

90.     On March 17, 2015, Atlanta voters overwhelmingly supported the Renew Atlanta Infrastructure Bond ("Renew Atlanta") in a special election. (Wynn Decl., ¶ 19; see Exhibit E-2 – Renew Atlanta Website at Beckley-COA 000540).

91.     A $250 million infrastructure bond program, Renew Atlanta is the first major investment in the City's aboveground infrastructure in more than a decade.  (Id.)

92.     Renew Atlanta was developed through years of research and more than 100 public meetings with extensive community input.  (Wynn Decl., ¶ 20; see Ex. E-2 at Beckley-COA 000540).

93.     Renew Atlanta is a first step toward resolving the City's infrastructure repair backlog of more than $900 million.  (Wynn Decl., ¶ 21; see Ex. E-2 at Beckley-COA 000543).

94.     Renew Atlanta bond funding will allow the City to make urgent repairs to Atlanta's infrastructure without raising property taxes. (<u>Id.</u>)

95.     Among the projects included in Renew Atlanta is the construction and repair of curbs and sidewalks with ADA ramps for better mobility. (Wynn Decl., ¶ 22; <u>see</u> Ex. E-2 at Beckley-COA at 000544).

96.     Specifically, in accordance with the ADA, the City builds accessible ramps into sidewalks when completing road resurfacing or other sidewalk repairs with Renew Atlanta funds. (Wynn Decl., ¶ 22; <u>see</u> Ex. E-2 at Beckley-COA 000546).

97.     Renew Atlanta roadway projects also include ADA ramp construction, curb repairs, and sidewalk repairs. (Wynn Decl., ¶ 23; <u>see</u> Ex. E-2 at Beckley-COA 000547).

98.     Renew Atlanta specifically allocates $5,239,992 for ADA projects. (Wynn Decl., ¶ 23; <u>see</u> Ex. E-3 – Renew Atlanta 2015 Infrastructure Vote at Beckley-COA 000561).

99.     ADA ramp installation is also included in the $51,941,543 in funding designated for Local Projects by Council District. (Wynn Decl., ¶ 24; <u>see</u> Ex. E-3 at Beckley-COA 000562).

100. Renew Atlanta also allocates funding for the repair and replacement of high-priority bridges. (Wynn Decl., ¶ 25; <u>see</u> Ex. C-2 at Beckley-COA 000546).

101. On May 4, 2015, Atlanta City Council adopted legislation identifying a list of projects to be funded under Renew Atlanta. (Wynn Decl., ¶ 26; <u>see</u> Exhibit E-4 – Atlanta City Council Resolution 15-R-3527 at Beckley-COA 000525-27).

102. The bridge located at Martin Luther King, Jr. Drive is listed among the bridges slated for replacement with Renew Atlanta funds. (Wynn Decl., ¶ 26; <u>see</u> Ex. E-4 at Beckley-COA 000528).

103. Other projects include an ADA Ramp and Sidewalk Replacement Program as well as transportation projects that include ADA curb and sidewalk improvements in all twelve (12) Council Districts in Atlanta. (Wynn Decl., ¶ 27; <u>see</u> Ex. E-4 at Beckley-COA 000530-37).

**VII.    The Installation Of ADA Compliant Ramps At The Intersection Of Centennial Olympic Park Drive And Martin Luther King, Jr. Drive Would Fundamentally Alter The City's Service, Program, Or Activity And Would Impose An Undue Burden On The City.**

104. As noted above, Centennial Olympic Park Drive and Martin Luther King, Jr. Drive converge at a bridge, which is where the intersection at issue is located. (Wynn Decl., ¶ 3; Ayo Decl., ¶ 3).

105.   The bridge located at Martin Luther King, Jr. Drive was constructed in 1961.  (Ayo Dep. at 6, ll. 2-8; Ayo Decl., ¶ 5; see Exhibit F-1 to Ayo Decl. – Bridge Inventory Data Listing).

106.   Michael Ayo, the City's bridge engineer, has assessed whether ADA compliant sidewalk ramps can be installed at the intersection.  (Ayo Dep. at 5, ll. 20-22; p. 7, ll. 5-12; Ayo Decl., ¶¶ 1-2).

107.   Mr. Ayo is the designee of the DPW Commissioner pursuant to 28 C.F.R. § 35.150(a)(3).  (Ayo Decl., ¶ 2).

108.   Mr. Ayo concluded that the installation of ADA sidewalk ramps would require a major redesign of the intersection to bring it into compliance with ADA requirements.  (Ayo Dep. at 7, ll. 13-20; Ayo Decl., ¶ 5).

109.   From an engineering standpoint, the installation of ADA compliant sidewalk ramps at the intersection is structurally challenging because the sidewalks are cantilevered, which means that they are not fully supported.  (Ayo Dep. at 7, l. 21-p. 8, l. 21; Ayo Decl., ¶ 6).

110.   Cantilevers must be firmly anchored on one side in order to hold up the necessary weight on the free standing side.  (Ayo Decl., ¶ 7).

111.  A common example of a small cantilever is a diving board because one side is firmly attached to the ground so that the other side can hold a person's weight suspended over the water.  (Id.)

112.  To support the bridge and the sidewalks along Martin Luther King, Jr. Drive, rebars (i.e., steel rods) are embedded inside the concrete.  (Ayo Dep. at 7, l. 21-p. 8, l. 21; Ayo Decl., ¶ 8).

113.  Because the rebars are located below the bridge deck, it is a structural challenge to cut through the rebars embedded inside the concrete.  (Ayo Dep. at 7, l. 21-p. 8, l. 21; Ayo Decl.,    ¶ 8).

114.  Once the rebars are cut, the cantilevered sections of the bridge, which are supported by the rebars, are in danger of collapsing.  (Ayo Dep. at 7, l. 21-p. 8, l. 21; Ayo Decl., ¶ 9).

115.  Even if one section of the bridge collapsed, the bridge would no longer be safe for pedestrian and vehicle traffic.  (Ayo Decl., ¶ 9).

116.  To ensure ADA compliant sidewalk ramps are safely installed at the intersection, Mr. Ayo collaborated with the local engineering firm of Burns McDonnell to redesign the intersection at issue.  (Ayo Decl., ¶ 10; see Exhibit F-2 – Burns McDonnell Design Schematics).

117. Given the unique safety risks posed by cutting through the existing bridge's rebars to install ADA compliant ramps, the ramps will be installed at the time the bridge at Martin Luther King, Jr. Drive is replaced. (Ayo Decl., ¶ 11).

118. Renew Atlanta will provide funding for the installation of ADA compliant ramps, which will be constructed at the intersection of Centennial Olympic Park Drive and Martin Luther King, Jr. Drive when the Martin Luther King, Jr. Drive bridge is replaced. (Wynn Dep. at 41, ll. 16-20; Wynn Decl., ¶ 28).

119. Generally, it takes approximately two years for the completion of a bridge from the design phase to actual construction. (Ayo Decl., ¶ 12).

120. Although construction completion dates cannot be guaranteed, the bridge at Martin Luther King, Jr. Drive is expected to be replaced by 2018. (Ayo Decl., ¶ 13).

121. In Mr. Ayo's professional opinion, the installation of ADA compliant sidewalks at the intersection of Centennial Olympic Park Drive and Martin Luther King, Jr. Drive as it currently exists would fundamentally alter the City's services, programs, or activities and/or would impose undue administrative and financial burdens on the City. (Ayo Decl., ¶ 14).

Respectfully submitted,

CATHY HAMPTON
City Attorney
Georgia Bar No. 321899

*/s/ Anissa D. Floyd*
Anissa D. Floyd
Georgia Bar No. 141747
Counsel for Defendant

CITY OF ATLANTA LAW DEPARTMENT
55 Trinity Avenue, S.W., Suite 5000
Atlanta, Georgia 30303-3520
Telephone: (404) 546-4155
Facsimile: (404) 979-7649
Email: adfloyd@atlantaga.gov

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| ELIZABETH BECKLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:16-cv-01435-MHC |
| ) | |
| CITY OF ATLANTA, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## CERTIFICATE OF FONT

I hereby certify that DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL

FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT was prepared in Times

New Roman 14-point font in conformance with Local Rule 5.1C.

*/s/ Anissa D. Floyd*
Anissa D. Floyd
Counsel for Defendant

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |
|---|---|
| ELIZABETH BECKLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:16-cv-01435-MHC |
| | ) |
| CITY OF ATLANTA, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2017, I served a true and correct copy of

DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS

MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF

system, which will automatically send notification to the following counsel of

record:

James Radford, Esq.
Radford & Keebaugh, LLC
315 W. Ponce de Leon Ave., Suite 1080
Decatur, Georgia 30030

*/s/ Anissa D. Floyd*
Anissa D. Floyd
Counsel for Defendant